**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LAWESE DRAYTON, Individually and as** | : | **CIVIL ACTION** |
| **Personal Representative of the Estate of** | : | |
| **RAYMOND DRAYTON, Deceased** | : | |
| | : | |
| **v.** | : | **No. 03-2334** |
| | : | |
| **PILGRIM'S PRIDE CORPORATION and** | : | |
| **JACK LAMBERSKY POULTRY CO., INC.,** | : | |
| **d/b/a J.L. FOODS CO., INC.** | : | |
| _____ | : | |
| **LARON HARVEY, a Minor, by His Mother** | : | **CIVIL ACTION** |
| **and Guardian, SHAKANDRA HAMPTON,** | : | |
| **and SHAKANDRA HAMPTON** | : | |
| | : | |
| **v.** | : | **No. 03-3500** |
| | : | |
| **PILGRIM'S PRIDE CORPORATION and** | : | |
| **JACK LAMBERSKY POULTRY CO., INC.** | : | |
| _____ | : | |
| **JODY LEVONCHUCK, Administrator of the** | : | **CIVIL ACTION** |
| **Estate of JOSEPH CUSATO, Deceased** | : | |
| | : | |
| **v.** | : | **No. 04-3577** |
| | : | |
| **PILGRIM'S PRIDE CORPORATION and** | : | |
| **JACK LAMBERSKY POULTRY CO., INC.,** | : | |
| **d/b/a J.L. FOODS CO., INC.** | : | |
| _____ | : | |
| **PATRICIA NIEMTZOW, Individually** | : | **CIVIL ACTION** |
| **and as Personal Representative of the** | : | |
| **Estate of FRANK NIEMTZOW, Deceased** | : | |
| | : | |
| **v.** | : | **No. 04-3974** |
| | : | |
| **WAMPLER FOODS, a wholly owned** | : | |
| **subsidiary of PILGRIM'S PRIDE** | : | |
| **CORPORATION, a Delaware Corporation,** | : | |
| **and JACK LAMBERSKY POULTRY** | : | |
| **COMPANY, INC., a New Jersey** | : | |
| **Corporation d/b/a J. L. FOODS CO., INC.** | : | |

**Savage, J.**                                                                    **May 4, 2006**

### <u>MEMORANDUM AND ORDER</u>

The two defendants, who the Centers for Disease Control and Prevention determined had produced turkey products tainted with a strain of Listeriosis[1] of the same type that caused the deaths and injuries in these food product liability cases, have moved for summary judgment.  Each defendant contends that the plaintiffs cannot establish that it caused the injuries because they are unable to identify a specific product they or their decedents ingested.   In addition to opposing the motions by arguing that they have presented sufficient circumstantial evidence of causation, the plaintiffs have filed a cross-motion for summary judgment requesting application of the alternative liability theory as embodied in the RESTATEMENT (SECOND) OF TORTS § 433(b)(3).  They assert that the defendants are alternatively liable for injuries arising from the outbreak of Listeriosis in the summer and fall of 2002 that caused the deaths and injuries in these cases.

Finding that there are disputed material facts and that the plaintiffs have proffered sufficient evidence from which a reasonable jury could conclude that either or both of the defendants' products caused the deaths and injuries, I shall deny the motions for summary judgment.[2]  Because the evidence, when viewed in the light most favorable to the plaintiffs

---

[1] Listeriosis is a life threatening food borne illness caused by Listerio monocytogenes.  *See* http://www.cdc.gov/ncidod/dbmd/diseaseinfo/listeriosis_g.htm.

[2] Summary judgment is appropriate only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  In examining the motions, we must view the facts in the light most favorable to the nonmovants and draw all reasonable inferences in their favor. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159-60 (3d Cir.2003).

To defeat summary judgment, the opposing parties must come forward with probative evidence establishing the prima facie elements of their claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  They must show more than the "mere existence of a scintilla of evidence" for elements on which they bear the burden of production.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

would permit a jury to find that the defendants – and no others – acted in substantially the same manner at the same time in causing the injuries, alternate liability will be applied. Accordingly, the burden will be on the defendants to show which one, if either, supplied the tainted product that caused each individual plaintiff's harm.

### The Listeria Outbreak

In the summer of 2002, the Centers for Disease Control and Prevention (CDC), the United States Department of Agriculture's Food Safety and Inspection Service (FSIS) and the Philadelphia Department of Health began a joint investigation of a suspected outbreak of listeria in the Northeastern region of the United States.  As a result of the investigation, the CDC determined that ready to eat (RTE) turkey products adulterated with Listeriosis monocytogenes (Lm) manufactured by either or both Pilgrim's Pride Corporation (PPC) and Jack Lambersky Poultry Co., Inc. d/b/a/ J.L. Foods (JLF) were the cause of the outbreak.[3]  The CDC concluded that:

> Based on the epidemiologic and microbiological findings in this investigation, it cannot be stated with certainty which of these plants [The JLF plant in Camden, New Jersey or the PPC plant in Franconia, Pennsylvania] was the primary source of the outbreak, or whether both plants were involved.  Plant B [the JLF Camden plant] was likely linked to illnesses in the outbreak, because the outbreak strain was found in its turkey products.  However, it is possible that Plant A [the PPC Franconia plant] was also involved, as the outbreak strain was found in its environment . . . .[4]

A peer reviewed article published in the periodical *Clinical Infectious Diseases* on November 23, 2005, reported that FSIS found the Lm strain identified by the CDC in two

---

[3] CDC Trip Report, May 9, 2003, at 11-12 (Ex. 1, Pl. Stmt. of Disputed Facts) (Ex. 1, Pl. Resp. to Mot. for Summ. J.) (Doc. No. 98, Civ. A. 03-2334) (PSDF).

[4] CDC Trip Report, May, 9, 2003, at 12 (Ex.1, PSDF).  The parties do not dispute that "Plant A" referenced in the report is the PPC Franconia plant and "Plant B" is the JLF Camden plant.

of eighteen intact turkey products sampled at the JLF plant.[5]  The strain was also found in the PPC Franconia plant's environment, including in the room where exposed turkey products were handled.[6]  The outbreak strain of Lm was first identified by the CDC on September 2, 2002.[7]  No other listeriosis outbreaks caused by this strain have occurred since the 2002 outbreak.[8]

As a result of the outbreak, PPC initially recalled approximately 300,000 pounds of product produced on the same day the sample was tested.   PPC eventually recalled all products produced between May 1 and October 11, 2002, entailing approximately 27.4 million pounds of RTE poultry products.[9]  JLF first recalled approximately 200,000 pounds of RTE poultry products produced the same week the sample was tested and later about 4.2 million pounds produced between May 29 and November 2, 2002.[10]  No other manufacturers recalled RTE poultry products as a result of the outbreak.  After the recalls, there were no other listeriosis outbreaks instigated by the same strain that caused the plaintiffs' injuries.[11]

The CDC and FSIS investigation excluded any suggestion of downstream sources

---

[5] Sami L. Gottleib, et al., *Multistate Outbreak of Listeriosis Limited to Turkey Deli Meat and Subsequent Changes in U.S. Regulatory Policy*, 42 CLINICAL INFECTIOUS DISEASES 29, 34 (2006) (Ex. 7, PSDF).

[6] *Id.*

[7] CDC Trip Report, May, 9, 2003, at 1 (Ex.1, PSDF).

[8] Expert Report of Sophia Kathariou, Ph.D. ¶ 12 (Ex. 33, PSDF).

[9] CDC Trip Report, May, 9, 2003, at 11 (Ex.1, PSDF).

[10] *Id.*

[11] Expert Report of Arthur Reingold, M.D. ¶ 5(g) (Ex. 8, PSDF).

of the contamination, that is, contamination of the RTE turkey after it left the two processing plants.[12]   In addition, no samples from other processing plants tested positive for the Lm strain that caused the outbreak.[13]

Plaintiffs have proffered several experts who opine that the only sources of the Lm outbreak were JLF and PPC.  Plaintiffs' microbiology expert, Dr. Stephen Knabel, has opined that there is no valid data to support a theory that any product, plant or source other than JLF and/or PPC caused or contributed to this outbreak.[14]  Plaintiffs' genetics expert, Dr. Sophia Kathariou,[15] opined that the fact that the outbreak strain was present at both plants during the same outbreak period does not suggest an outbreak source other than one or both plants.[16]  She adds that these were the only processing plants implicated in the outbreak by both epidemiological and bacteriological data.[17]

Plaintiffs' epidemiology expert, Dr. A.L. Reingold, testified that either or both plants were involved in the outbreak, but that he could not opine with reasonable certainty that

---

[12] *Id.* at ¶ 5(i).

[13] CDC Trip Report, May, 9, 2003, at 8 (Ex.1, PSDF);  Sami L. Gottleib, et al., *Multistate Outbreak of Listeriosis Limited to Turkey Deli Meat and Subsequent Changes in U.S. Regulatory Policy*, 42 CLINICAL INFECTIOUS DISEASES 29, 32 (2006) (Ex. 7, PSDF).

[14] Expert Report of Stephen J. Knabel, Ph.D. at 19 (Ex. 36, PSDF).

[15] PPC has filed a motion to strike certain testimony and opinions of Dr. Kathariou on the ground that she conducted testing after the deadline for filing expert reports, and offered opinions in her deposition based upon the late testing.  None of the allegedly late testing served as the basis for the portions of Dr. Kathariou's opinion pertinent to disposition of this motion.

[16] Expert Report of Sophia Kathariou, Ph.D. ¶ 23 (Ex. 33, PSDF).

[17] *Id.*  Conversely, to support their argument that plaintiffs have failed to name all possible tortious actors, the defendants direct our attention to a portion of the CDC report that suggests that at least two individuals who contracted the outbreak strain lived at a nursing home that did not receive any products from either one of them.  CDC Trip Report, May, 9, 2003, at 8 (Ex.1, PSDF)

5

both were.[18]  In his report, Reingold opined that all five victims had laboratory confirmed

invasive infections caused by Lm, all five were part of the larger outbreak, all five acquired

their Lm infections by eating contaminated turkey products produced by either JLF or PPC

or both, and that there was no credible evidence of any outbreak source other than one or

both of the defendants' processing plants.[19]

### Raymond Drayton

Plaintiff Lawese Drayton's deceased husband, Raymond Drayton, became ill with

flu-like symptoms in late August of 2002.[20]   He went to the emergency room of

Germantown Hospital on August 28, and was later transferred to Albert Einstein Hospital

where he succumbed to his illness four days later.[21]  His death certificate lists the cause

of death as listeria meningitis.[22]

When her husband became ill, Mrs. Drayton did not know what had made him sick.[23]

On December 18, 2002, she received a letter from the Philadelphia Department of Health

stating:

> Please be advised that the [CDC] performed all genotype analysis on the
> Listeria isolate recovered from Mr. Drayton. . . .  I do not have [a] written
> report of the genotype for this organism; however I have been verbally told
> that the PFGE type is: GX6 A16.0235; GX 6 A12.003.  This is the strain of
> Listeria responsible for an outbreak of infections in our region during July-

---

[18] Reingold Dep. at 95-96 (Ex. G, Mot. for Summ. J. of Wampler Foods ) (Doc. No. 50, Civ. A. 04-3974).

[19] Expert Report of Arthur Reingold, M.D. ¶¶ 5(d-g) (Ex. 8, PSDF).

[20] Drayton Dep. at 112 (Ex.1, Mot. for Summ. J. of JL Poultry Co.) (Doc. No. 70, Civ. A. 03-2334).

[21] *Id.* at 24, 126.

[22] *Compl.* ¶ 9.

[23] Drayton Dep. at  84 (Ex.1, Mot. for Summ. J. of JL Poultry Co.) (Doc. No. 70, Civ. A. 03-2334).

October 2002.[24]

In the summer of 2002, Mrs. Drayton purchased for herself and her husband several poultry products, including variety packs of different types of turkey cold cuts, uncooked turkey ham, turkey bacon, uncooked chicken breast, "Butterball" brand turkey, and "Perdue" brand chicken.[25]  Mr. Drayton also ate sliced turkey on turkey hoagies and may have eaten turkey at his brother's home.[26]  At her deposition, Mrs. Drayton could not identify the brands of turkey, other than "Oscar Mayer" and "Louis Rich," she had purchased.[27]  She also testified, however, that she had purchased "other brands," but could not recall all of the types and brands of poultry products she had purchased.[28]

In her declaration appended to the plaintiffs' response to the summary judgment motion, Mrs. Drayton stated that in the months preceding her husband's death, turkey products with the brand names "Hatfield" and "Wampler," products of JLF and PPC, respectively, were in her home.[29]  She proffers the Declaration to supplement her deposition testimony because she had not been asked in her deposition about those

---

[24] Philadelphia Health Department letter dated December 18, 2002 (Ex. 2, PSDF).  Defendant PPC has filed a motion to strike the CDC Trip Report (Ex., PSDF), the Philadelphia Health Department letter dated December 18, 2002 (Ex. 2, PSDF); the CDC "Final Line List" showing those cases matched to the outbreak strain (Ex. 32, PSDF); and the FSIS Assessment of the Franconia plant (Ex. 49, PSDF), on the grounds that they are unauthenticated and contain hearsay statements.  Contrary to PPC's argument, assuming plaintiffs authenticate the documents, they are admissible under the public record or report exception.  FED. R. EVID. 803(8).  To the extent PPC takes issue with the documents' factual recitations or methodologies, those arguments address the weight to be accorded the documents, not their admissibility.

[25] Drayton Dep. at 34, 36, 40-41, 82-84 (Ex. B, Mot. for Summ. J. of PPC) (Doc. No. 79, Civ A. 03-2334).

[26] Drayton Dec. (Mar. 15, 2006) ¶¶ 13-14 (Ex. 4, PSDF).

[27] Drayton Dep. at 59-61 (Ex. B, Mot. for Summ. J. of PPC) (Doc. No. 79, Civ A. 03-2334).

[28] Id.

[29] Lawrese Drayton Dec. (Mar. 15, 2006) ¶ 7 (Ex. 4, PSDF).

7

specific brand names.[30]  Thus, the record, as it now stands, permits a finding that Mr.

Drayton had consumed turkey products processed by both of the defendants.

Frank Niemtzow

Plaintiff Patricia Niemtzow's father, Frank Niemtzow, was a retired physician who

died at age 98 on November 23, 2002.  Dr. Niemtzow was admitted to Presbyterian

Hospital on August 19, 2002, where listeria was found in the drainage of a pre-existing liver

abscess.[31]  He underwent a series of hospitalizations until his death on November 23,

2002.[32]  The cause of death was listeriosis and sepsis due to listeriosis.[33]  Mr. Niemtzow's

strain of Lm matched the outbreak strain traced to JLF and PPC by the CDC.[34]

Prior to her father's death, Ms. Niemtzow purchased RTE turkey for her father, but

---

[30] Lawrese Drayton Dec. (Mar. 15, 2006) ¶ 6 (Ex. 4, PSDF).  In addition to the product identifications, Mrs. Drayton avers in her declaration that her husband purchased sandwiches outside the home, even though she had stated several times in her deposition that he had not done so because he feared cross-contamination with pork products.  Drayton Dep. at 63, 65, 164 (Ex. B, Mot. for Summ. J. of PPC) (Doc. No. 79, Civ A. 03-2334.)  Defendant PPC has filed a motion to strike the declaration, as well as the declaration of Renee Drayton, which contains the same averments, on the ground that they are shams designed to cure the product identification defect allegedly created by the deposition testimony.

As PPC correctly argues, a party may not create a material factual issue by submitting an affidavit disputing her own prior testimony.  *Baer v. Chase*, 392 F.3d 609, 623-24 (3d Cir. 2004).  However, her declaration does not contradict Mrs. Drayton's prior product identification testimony.  Rather, it supplements it.  She avers she filed her declaration because the brand names Wampler and Hatfield were not mentioned by counsel during the deposition.  The excerpts submitted by the parties confirm this averment.  While counsel asked her to recall all brands she had purchased, counsel never specifically asked about Wampler and Hatfield.  Of course, Mrs. Drayton's failure to remember may be used to impeach her product identification testimony at trial.

Renee Drayton was never deposed.  Consequently, her declaration does not contradict any prior testimony she had given.  It is new information supplementing the record.  In any event, whether the declarations are a sham, as PPC asserts they are, calls for a credibility determination which is for the jury to make.  Hence, the motion to strike the declarations will be denied.

[31] Niemtzow Dep. at 53 (Ex. 3, Pl. Supp. Opp. to Def. JL Mot. for Summ. J.) (Doc. No. 59, Civ. A. No. 04-3974) (Niemtzow Dep.).

[32] *Id.* at 56.

[33] *Id.* at 60, 65.

[34] CDC Trip Report, May, 9, 2003 (Ex.1, PSDF); Expert Report of Sophia Kathariou, Ph.D. ¶¶ 24-28 (Ex. 33, PSDF).

not by brand names.[35]  She does not recall the brands that she bought.[36]  She reported to the CDC that she had purchased RTE turkey from Sarcone's Deli, Wawa, Barson's Deli and Great Scott.[37]  She bought store brand turkey at Super Fresh and at Barson's Deli.[38]

PPC supplied RTE turkey to Great Scott, a store where the Niemtzows bought RTE turkey, during the summer of 2002.[39]  There is evidence that Dr. Niemtzow also had access to JLF products.  Ms. Neimtzow  testified that she did not purchase turkey at Barson's by brand name.[40]  The failure to specify a brand raises the inference that she was sold Barson's house brand.  JLF supplied that retailer with its LaPetit Poulet product for use as its store brand.[41]  Thus, the evidence permits a finding that Dr. Niemtzow had consumed turkey products processed by both of the defendants.

Joseph Cusato

Joseph Cusato died on August 1, 2002, at age 62.[42]  He was hospitalized on July 30, 2002, and diagnosed with bacterial meningitis.  His spinal fluid tested positive for listeria.[43]  The Lm strain in the isolate taken from Mr. Cusato was tested by the CDC and

---

[35] *Id.* at 34-35

[36] *Id.* at 34.

[37] Listeria Patient Questionnaire at 6 (Ex. 11, PSDF).

[38] Niemtzow Dep. at 35.

[39] Kramer Epidemiological Product Chart (Ex. 14, PSDF).

[40] Neimtzow Dep. at 33-35.

[41] Kramer Dep. at 136-37 (Ex. 4, Pl. Supp. Opp. to Def. JL Mot. for Summ. J.) (Doc. No. 59, Civ. A. No. 04-3974).

[42] Jody Levonchuk Dep. 14, 17 (Ex. F to Attachment 2, Mem. in Support by JL Poultry Co.) (Doc. No. 113, Civ. A. 03-2334) (Jody Levonchuk Dep.)

[43] *Id.* at 40.

found to match the isolates taken from PPC's Franconia Plant and JLF's product.[44]

Cusato's other daughter, Robyn Cusato, sometimes took her father grocery shopping.[45]  Other times, he shopped with a friend.[46]  He bought food from at least six different stores, as well as six different restaurants.[47]  Cusato purchased RTE turkey products made by Tyson, Oscar Mayer, Jimmy Dean, Wampler and Hatfield.[48]  She also purchased pre-packaged Dietz & Watson and Wampler turkey products.[49] Cusato testified her father bought what was on sale, without regard to brand.[50]  Hatfield bacon, Pilgrim's Pride turkey pastrami, Wampler microwavable poultry products and Wampler pre-packaged variety pack RTE turkey were found in his refrigerator after his death.[51]  Jody Levonchuk believes, without offering any evidence, that he may also have eaten Golden Acre and/or Reliance brand products.[52]  Wampler is a PPC product, and Hatfield, a JLF product.  In short, like the late Mr. Drayton and the late Dr. Niemtzow, Mr. Cusato had turkey products processed by both defendants.

---

[44] Expert Report of Sophia Kathariou, Ph.D. ¶ 28 (Ex. 33, PSDF).

[45] Jody Levonchuk Dep. at 19.

[46] *Id.*

[47] Cusato Dep. at 16-18 (Ex. C, Mot. for Summ. J. of PPC (Doc. No. 35, Civ. A. 04-3577)) (Cusato Dep.); Jody Levonchuk Dep. at 28.

[48] Cusato Dep. at 22.

[49] *Id.* at 26.

[50] *Id.* at 24-25.

[51] Albert Levonchuk Dep. at 17, 19-20, 22, 27 (Ex. H to Attachment 2, Mem. in Support by JL Poultry Co.) (Doc. No. 113, Civ. A. 03-2334).

[52] Levonchuk Ans. to Interrogatories ¶ 1 (Ex. I to Attachment 2, Mem. in Support by JL Poultry Co.) (Doc. No. 113, Civ. A. 03-2334).

<u>Shakandra Hampton and Laron Harvey</u>

Laron Harvey was born prematurely with listeriosis on August 19, 2002.[53]   His mother, Shakandra Hampton, was hospitalized at Crozier-Chester Hospital with complaints of high blood pressure, chills, nausea, vomiting, and labor contractions on the day her son was born.[54]   She remained in the hospital two weeks after his birth.[55]   She was diagnosed with listeriosis.[56]   Laron's and his mother's Lm strains matched the outbreak strain traced by the CDC to JLF's product and PPC's plant.[57]

Laron was not breathing at birth and had to be respirated with a bag and a mask.[58] He remained in the hospital for three months.[59]   After the first twenty-two days, he was transferred to Childrens Hospital of Philadelphia.  The Crozier-Chester discharge summary diagnosed Laron with respiratory distress syndrome, jaundice, infection specific to the perinatal period, septicemia, necrotizing entercolitis, anemia, congenital anomaly of the pulmonary artery and esophageal reflux.[60]

Dr. McGuckin, an expert on infectious diseases, has opined that Laron's premature

---

[53] Hampton Dep. at 28 (Ex. A to Attachment 2, Mem. in Support by JL Poultry Co.) (Doc. No. 113, Civ. A. 03-2334).

[54] *Id.* at 29, 31.

[55] *Id.* at 37.

[56] *Id.* at 36.

[57] CDC Trip Report, May, 9, 2003 (Ex.1, PSDF); Expert Report of Sophia Kathariou, Ph.D. ¶¶ 24-28 (Ex. 33, PSDF).

[58] Physician's Progress Notes, Aug. 11, 2002 (Ex. 21, PSDF).

[59] Hampton Dep. at 43-44 (Ex. A to Attachment 2, Mem. in Support by JL Poultry Co.) (Doc. No. 113, Civ. A. 03-2334).

[60] Crozier Keyston Health System Summary of Discharge, Sept. 10, 1992 (Ex. 22, PSDF).

birth was the result of Ms. Hampton's perinatal listeriosis.[61]   Laron is developmentally delayed, is deaf in his left ear and predominantly deaf in his right, has severe asthma, and cannot put more than two or three words together at a time.  He  now attends a program for mentally challenged children.[62]

In the three month period before Laron's premature birth, Ms. Hampton had purchased RTE turkey at the Chester Shop & Save, which stocked Le Petite Poulet brand turkey deli meat processed by JLF.[63]  She had also bought Wampler and Hatfield products, the former a PPC brand and the latter produced by JLF.[64]  She could not recall whether the Hatfield product was turkey, bologna, or some other product.[65]  Thus, the record permits a finding that during the outbreak period, Ms. Hampton had consumed turkey products made by both defendants.

## Evidence of Exposure

When viewed in the light most favorable to the plaintiffs, the facts demonstrate that each of their Lm isolates had the same bacteriological and molecular characteristics as the strain implicated in the 2002 outbreak, which were traced to either or both JLF and PPC. The plaintiffs have created a jury issue that each victim had consumed RTE turkey products manufactured by both defendants during the outbreak period.

---

[61] Final Report of Dr. Maryanne McGuckin at 1 (Ex. 24, PSDF).

[62] Narrative Report of Donald J. Fishman, M.D. (Ex. 25, PSDF).

[63] Kramer Epidemiological Product Chart (Ex. 14, PSDF); Hampton Food Stamp Payments (Ex. 27, PSDF); Hampton Product Identification Interrogatories ¶¶ 1-5 (Ex. 28, PSDF).

[64] Hampton Product Identification Interrogatories ¶ 2 (Ex. 28, PSDF).

[65] Hampton Dep. at 70, 199 (Ex. A to Attachment 2, Mem. in Support by JL Poultry Co.) (Doc. No. 113, Civ. A. 03-2334)..

JLF and PPC both argue the plaintiffs cannot establish the causation element of their claims because they cannot identify either defendant as the manufacturer of the specific turkey product that caused their illnesses.  Pennsylvania has rejected an absolute rule that precludes a plaintiff from presenting evidence tending to prove the identity of the manufacturer of the injury-causing product when the product is unavailable.  *O'Donnell v. Big Yank, Inc.*, 696 A.2d 846, 849 (Pa. Super. 1997).  In such a case, the plaintiff may prove product identification by circumstantial evidence.  *Payton v. Pa. Sling Co.*, 710 A.2d 1221, 1224 (Pa. Super 1998).  In other words, where the identification can be proven without the specific product, a plaintiff can pursue her claim despite the blameless loss or destruction of the product prior to suit.

In these cases, the circumstantial evidence that the plaintiffs or their decedents purchased PPC and JLF products within the outbreak period is sufficient to create a jury issue and defeat summary judgment.[66]  The plaintiffs' proffered evidence consists of (1) their testimonies that they or their decedents all purchased RTE turkey products made by both defendants, (2) they had access to both defendants' products, (3) the CDC tests identifying their exposures to the specific Lm outbreak strain traced to both defendants, and (4) the outbreak strain was found in the plant or product of these two companies. Thus, because the circumstantial evidence permits a finding or a reasonable inference that

---

[66]JLF's argument that *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 367, 368 n. 4 (3d Cir. 1990), that Pennsylvania law requires the plaintiffs to show not only that they were exposed to the defendant's products, but also that they ate JLF's products on a "regular basis" in the months preceding their illness is a mischaracterization of the holding of the case.  *Robertson* involved alleged asbestos exposure.  The nature of asbestos exposure and the long period before exposure results in illness were the bases of the Third Circuit's discussion of the requirement of regular exposure to the product.  *See also Eckenrod v. GAF Corp.*, 544 A.2d 50 (Pa. Super. 1988).  Nothing in *Robertson* suggests a requirement of lengthy prior exposure to a company's product where the alleged injury results from a toxin that causes sudden and acute symptoms.

each victim was exposed to the Lm outbreak strain through one or both of the defendants' products, it is for the jury to determine whether the plaintiff actually ate the tainted product made by either or both defendants after considering the credibility of the witnesses' testimony and the adequacy of their identifications.

Notwithstanding JLF's argument that no plaintiff has actually stated that she or the person she represents ever ate the turkey, it is reasonable to assume that if tainted products were purchased and the person became ill from a disease traced to that product, the person actually consumed the product.  Accordingly, the failure to state specifically that the person actually consumed the product is not a ground for entry of summary judgment.

The issue is not whether the plaintiff in each case can identify the specific defendant's product that caused her injury.  The issue, in each of these cases, is whether the plaintiff can identify having ingested tainted product, leaving open the question of which defendant's product, if not both, caused the injury.

### Alternative Liability

As the defendants correctly point out, the plaintiffs cannot specifically identify which defendant's product caused the injuries.  However, if Pennsylvania's alternative liability doctrine applies, the plaintiffs need not show which of the two defendants' products caused their injuries as long as they can prove that it had to have been one of their products. Hence, I shall analyze whether the alternative liability rule applies, relieving the plaintiffs of specifically linking the particular defendant's product to the injuries and shifting the burden to the defendants to prove that the other's product caused them.

What the plaintiffs cannot prove, and what medical science may never be able to show to a reasonable certainty, is which of the two companies' products actually caused

each plaintiff's infection.  However, this inability is not fatal to the plaintiffs' claims and does not absolve the defendants from liability for their tortious conduct.  Under Pennsylvania law, the alternative liability theory shifts the burden of showing which defendant actually caused the injury to the defendants to show which one of them supplied the tainted product.  If they are unable to identify the one causing the harm, both can be found liable as joint tortfeasors.

Proving that a defendant was negligent and that the plaintiff suffered an injury are insufficient to establish liability.  A plaintiff must also prove that the defendant's negligence caused the injury.  *Skipworth v. Lead Indus. Ass'n, Inc.*, 690 A.2d 169, 172 (Pa. 1997). The causation requirement is an essential element of a product liability case.  *Lilley v. Johns-Manville Corp.*, 596 A.2d 203, 207 (Pa. 1991).  Thus, a plaintiff must establish that a defendant's particular product caused her injury.

The alternative liability theory is an exception to the general causation rule.  Where defendants all act negligently toward a plaintiff and the plaintiff cannot ascertain which of them caused her injury, each defendant is held jointly and severally liable unless it can prove that it did not cause the harm.  In essence, the alternative liability theory operates to shift the burden to the defendants to prove their lack of responsibility for the injury.

The Pennsylvania Supreme Court has adopted alternative liability as defined in Section 433B(3) of the Restatement of Torts.  *Skipworth*, 690 A.2d at 174 (citing *Snoparsky v. Baer*, 266 A.2d 707 (Pa. 1970)).  The Restatement provides:

> Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of the them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.

15

RESTATEMENT (SECOND) OF TORTS § 433B(3) (1965).

Alternative liability under Section 433B(3) requires not only that each defendant's tortious conduct be simultaneous and identical, but that all potential tortfeasors be joined as defendants. RESTATEMENT (SECOND) OF TORTS § 433B(3), cmt. h.

Because the doctrine departs from standard negligence principles, it applies only when each defendant's conduct was substantially simultaneous and identical, and all potential defendants have been joined. *Skipworth* 690 A.2d at 174. Substantiality of conduct does not mean concerted conduct. The defendants need only have acted in substantially the same manner and need not have been aware that others were also acting at about the same time.

PPC argues that even though Pennsylvania recognizes the alternative liability doctrine, Pennsylvania courts have been reluctant to apply it outside the context of cases involving "hurled projectiles" and have not extended its application to products liability cases. Because no Pennsylvania appellate court has had the opportunity to address this precise issue does not mean that the theory is inapplicable to products liability cases. The rationale for the doctrine is equally applicable to such cases, as an analysis of the instant cases demonstrates.

These plaintiffs claim – and have presented sufficient evidence to show – that JLF and PPC both engaged in tortious conduct by negligently permitting their products or plants to become infected with Lm during the same period of time.[67]  Tainted products of both were on the market at the same time. Each did not have to know that the other was

---

[67]Among the conduct argued by the plaintiffs in their cross-motion to be tortious is the Defendants' violation of the Poultry Products Inspection Act, 21 U.S.C. § 458(a)), because poultry contaminated with Lm is considered "adulterated."

simultaneously selling negligently produced products to render their conduct substantially similar.

PPC also argues that the plaintiffs may not proceed under Section 433B(3) because they cannot demonstrate that both PPC and JLF acted tortiously in a simultaneous and identical manner.   Specifically, it asserts that because the two defendants operate independent production facilities, these requirements cannot be met.[68]   As stated earlier, the Restatement requires that defendants' conduct be "simultaneous in time, or substantially so, and . . . of substantially the same character, creating substantially the same risk of harm, on the part of each actor." RESTATEMENT (SECOND) OF TORTS § 433B(3), cmt. h.  Both actors' conduct need not be shown to have actually *caused* the harm.  To impose such a requirement would subvert the purpose of the rule shifting the burden to the defendants.  The plaintiffs  need only show that the conduct of both was tortious and was of  substantially  similar  character,  and  directed  at  the  plaintiffs.    Thus,  where  two defendants both distribute, at approximately the same time, tainted RTE turkey products containing the same rare strain of Lm that caused the plaintiff's injuries, the requirements of Section 433B(3) have been met and the burden shifts to each defendant to prove that

---

[68] PPC's argument relies upon the Dr. Reingold's deposition testimony.  He was asked:
>> Can you state to a reasonable degree of scientific certainty that both [PPC] and [JLF] produced contaminated ready-to-eat turkey products containing the outbreak strain as defined by the CDC during the courts of the outbreak in 2002?
 To which Dr. Reingold replied:
>> I think what I can say is that either one or both of them did but I don't know that I can say it to a reasonable certainty that both of them did. . . .
The questioning then continued:
>> Q.  . . . Are you saying that it could have been one or the other and you don't know which?
>> A.  I'm saying it could have been one or the other or it could have been both.
>> Q.  But you can't say to a reasonable degree of scientific certainty that it was both during the same outbreak period?
>> A.  Right.
Reingold Dep. at 95-96 (Ex. G, Mot. for Summ. J. of Wampler Foods (Doc. No. 50, Civ. A. 04-3974)).

the other, and not it, caused the harm.

Finally, PPC argues that the plaintiffs have failed to satisfy the requirement that all possible tortfeasors be named as defendants.  In support of its argument, PPC relies upon the portion of the CDC report which stated that two other outbreak victims who had no connection to either defendant were possibly infected from a third source.  The "all inclusion" requirement of joining all defendants applies to all potentially liable defendants, not all possible defendants.  Even though other processors may have produced tainted products, only processors to whose products the plaintiffs were potentially exposed need be named as defendants.  Given the opinions of the plaintiffs' experts that the data supports no other possible source of contamination for these plaintiffs, there is a genuine issue of material fact precluding summary judgment.  It remains for PPC and JLF to convince the jury that some other entity was the source of the Lm outbreak that affected these plaintiffs.

## Conclusion

There is ample evidence, if accepted by the jury, that would establish that each plaintiff had the Lm strain of Listeriosis, the defendants produced products containing the same strain that were consumed by the plaintiffs, the plaintiffs' injuries were caused by the strain of Listeriosis, and no other manufacturer's turkey products available to the plaintiffs were tainted.  Because the defendants acted in substantially the same manner at about the same time and are the only potential sources of the strain which caused the plaintiffs' injuries, the alternative liability theory will apply, relieving the plaintiffs of the requirement to show which of the two defendants' products caused their injuries.  Instead, the burden will shift to the defendants to prove that the other's product caused the injuries.  Therefore,

the defendants' motions for summary judgment will be denied and the plaintiffs' motion to proceed under the alternate liability theory will be granted.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LAWESE DRAYTON, Individually and as** | : | **CIVIL ACTION** |
| **Personal Representative of the Estate of** | : | |
| **RAYMOND DRAYTON, Deceased** | : | |
| | : | |
| **v.** | : | **No. 03-2334** |
| | : | |
| **PILGRIM'S PRIDE CORPORATION and** | : | |
| **JACK LAMBERSKY POULTRY CO., INC.,** | : | |
| **d/b/a J.L. FOODS CO., INC.** | : | |
| | : | |
| **LARON HARVEY, a Minor, by His Mother** | : | **CIVIL ACTION** |
| **and Guardian, SHAKANDRA HAMPTON,** | : | |
| **and SHAKANDRA HAMPTON** | : | |
| | : | |
| **v.** | : | **No. 03-3500** |
| | : | |
| **PILGRIM'S PRIDE CORPORATION and** | : | |
| **JACK LAMBERSKY POULTRY CO., INC.** | : | |
| | : | |
| **JODY LEVONCHUCK, Administrator of the** | : | **CIVIL ACTION** |
| **Estate of JOSEPH CUSATO, Deceased** | : | |
| | : | |
| **v.** | : | **No. 04-3577** |
| | : | |
| **PILGRIM'S PRIDE CORPORATION and** | : | |
| **JACK LAMBERSKY POULTRY CO., INC.,** | : | |
| **d/b/a J.L. FOODS CO., INC.** | : | |
| | : | |
| **PATRICIA NIEMTZOW, Individually** | : | **CIVIL ACTION** |
| **and as Personal Representative of the** | : | |
| **Estate of FRANK NIEMTZOW, Deceased** | : | |
| | : | |
| **v.** | : | **No. 04-3974** |
| | : | |
| **WAMPLER FOODS, a wholly owned** | : | |
| **subsidiary of PILGRIM'S PRIDE** | : | |
| **CORPORATION, a Delaware Corporation,** | : | |
| **and JACK LAMBERSKY POULTRY** | : | |
| **COMPANY, INC., a New Jersey** | : | |
| **Corporation d/b/a J. L. FOODS CO., INC.** | : | |

## <u>ORDER</u>

**AND NOW**, this 4th day of May, 2006, upon consideration of the motion of defendant Jack Lambersky Poultry Company, Inc. d/b/a/ J.L. Foods Co., Inc. for summary judgment, the motion of defendant Pilgrim's Pride Corporation for summary judgment, the cross-motion of the plaintiffs for summary judgment on the application of the alternative liability doctrine, and the parties' responses, it is **ORDERED** as follows:

1.      The motion of defendant Jack Lambersky Poultry Company, Inc. d/b/a/ J.L. Foods Co., Inc. for summary judgment (03-2334, Document No. 70) is **DENIED**.

2.      The motion of defendant Pilgrim's Pride Corporation for summary judgment (03-2334, Document No. 79; 03-3500, Document No. 52; 04-3974, Document No. 50; 04-3577, Document No. 35) is **DENIED**.

3.      The cross-motion of plaintiffs for summary judgment on the application of the alternative liability doctrine (03-2334, Document No. 97) is **GRANTED**.

4.      The motion of Defendant Pilgrims Pride Corporation to strike Plaintiffs' Exhibit 7 (03-2334, Document No. 103) is **DENIED.**

5.      The motion of Defendant Pilgrims Pride Corporation to strike Plaintiffs' Exhibits 1, 2, 32 and 49 (03-2334, Document No. 107) is **DENIED.**

6.      The motion of Defendant Pilgrims Pride Corporation to strike Plaintiffs' Exhibits 4 and 5 (03-2334, Document No. 108) is **DENIED**.


/s/ Timothy J. Savage
TIMOTHY J. SAVAGE, J.